RECEIVED

NOV - 7 2013

Clerk, U.S. District and
Bankruptcy Courts

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| IN RE RESTRAINT OF ALL ASSETS ) | |
| CONTAINED OR FORMERLY CONTAINED IN ) | |
| ONE JPMORGAN CHASE BANK ACCOUNT ) | Misc. No. *13-1256 RWR* |
| HELD BY SOLAYMAN CHAMSI ) | |
| ) | |

### UNITED STATES' EX PARTE APPLICATION TO ENFORCE AND REGISTER A FOREIGN RESTRAINING ORDER PURSUANT TO 28 U.S.C. § 2467(d)(3) AND STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Applicant United States of America, by and through its undersigned attorneys,
respectfully submits this application for a restraining order pursuant to 28 U.S.C. § 2467(d)(3).
The application seeks to enforce a foreign restraining order issued by the Dresden Local Court in
Germany in order to preserve the availability of assets in the United States until such time as
Germany presents a final forfeiture or confiscation judgment to the United States Central
Authority for execution pursuant to the relevant bilateral treaty.[1]  The German restraining order
was issued on September 9, 2013, and arises out of a German criminal investigation into a €6.6
million fraud scheme allegedly committed by Solayman Chamsi and his co-conspirators.  The
order has been certified for enforcement by the Acting Assistant Attorney General of the U.S.
Department of Justice's Criminal Division in accordance with 28 U.S.C. § 2467(d)(3) and
(d)(3)(B)(ii).  Chamsi is the owner or beneficial owner of the bank account named in this
application and attached proposed restraining order, which is believed to contain approximately
$80,000.

The Dresden Public Prosecutor's Office is investigating Chamsi (AKA Karim Liyo, AKA

---

[1] *See* Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal
Assistance in Criminal Matters, U.S.-Ger., Sen. Treaty Doc. 108-27, Oct. 14, 2003.

Jean Suly), a German national with Moroccan citizenship, in connection with his participation in a scheme to defraud investors between March and October 2008. On May 29, 2013, the Dresden Local Court issued an arrest warrant against Chamsi for violating § 263 of the German Criminal Code (serious fraud). The Court also issued sixteen restraining orders, one of which freezes Chamsi's assets up to €1,746,279 (approximately $2,363,150), an amount representing Chamsi's alleged criminal benefit from the €6.6 million fraud scheme. On September 4, 2013, German police executed numerous search and arrest warrants in coordination with Italian and Spanish authorities who made additional arrests abroad. Upon the officers' arrival at his home in Erkrath, Germany, Chamsi fled the premises. A search inside the residence revealed, among other things, bank statements for an account at JPMorgan Chase Bank ("JPMC") in the United States which was previously unknown to the German prosecutor. The prosecutor applied to amend the restraining order against Chamsi's assets to include this account and any other JPMC accounts that Chamsi may own or control. The amended restraining order was issued by Judge Vollmers on September 9, 2013. Chamsi is considered a fugitive, and because his other assets are restrained, the German prosecutor is concerned that Chamsi may deplete his U.S. bank account as he continues to evade arrest. Chamsi's assets, including those located in the United States, are subject to forfeiture under German law as the proceeds of crime or value corresponding thereto.

## I.    JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2467. Venue is proper in this Court pursuant to § 2467(c)(2)(B), which provides that "venue shall lie in the district court for the District of Columbia or in any other district in which the defendant or the property . . . may be found."

2

## II.    APPLICATION

The United States seeks issuance of a restraining order pursuant to § 2467(d)(3) to enforce a September 9, 2013, German restraining order against assets owned or controlled by Solayman Chamsi. On September 19, 2013, the United States received a formal mutual legal assistance request from Germany seeking, among other things, the restraint of all accounts held by Chamsi at JPMC. The United States, with the appropriate certification of the Acting Assistant Attorney General annexed hereto as Exhibit A, applies to this Court to issue the proposed order to freeze JPMorgan Chase Bank account number 468419499 and prevent Chamsi and all other persons from disposing of, dealing with, or diminishing the value of that account.

## III.    FACTUAL BACKGROUND

Solayman Chamsi's alleged crime concerns his role in marketing and selling the securities of a Swiss company called FP Freizeitprojekte Aktiengesellschaft AG ("FP AG"). FP AG, owned by Chamsi's co-conspirators, purchased a German company, Unterwasserwelt Projektentwicklungs GmBH (in English, "underwater world project development"), which was established for the purpose of planning, constructing, and operating an underwater resort and theme park at Geiseltal Lake in Germany. FP AG's shares were briefly traded off-floor on the Frankfurt Stock Exchange, but after a disappointing showing, its management contacted Chamsi to promote the stock and raise approximately €8 million in equity capital. An agreement was signed in February 2008 between FP AG and Chamsi's two Spanish companies, Locutorio Bienestar SL and Financial Service cbSL. The contract provided that Chamsi's companies would keep fifty percent of the net revenue, such that half of the funds raised from investors— who were unaware of the arrangement and hoping to earn a return on their contributions—were pocketed immediately by Chamsi, acting as a promoter. Chamsi and his team of employees

3

cold-called potential investors and obtained approximately €6.6 million in eight months. Throughout the period of telemarketing, Chamsi and his team falsely asserted that they worked for the reputable financial firm Rothschild and lied to investors that they possessed inside information indicating that FP AG was about to be acquired for a premium by the Walt Disney Company. One witness, a broker named Martin Schild, purchased €2.6 million in FP AG stock on behalf of his clients and told German police that he was contacted by a person claiming to be Nathan Rothenberg, Investment Manager at Rothschild. Schild said that the caller provided "strictly confidential" information that FP AG was about to undergo a hostile takeover by Disney and that the caller even faxed him a "secrecy agreement" so that he would not disclose the information. Indeed, there is evidence that the entire premise of the investment—building an underwater resort—may have been a charade from inception.

The fraudulent scheme was lucrative for Chamsi. His co-conspirators at FP AG directed €1,104,696.07 to his Banco Caja Rural account in Spain, which Chamsi opened under an alias ("Karim Liyo") with a false Dutch identification card. A portion of that money was later transferred to Chamsi's wife's account at Banco Bilbao Vizcaya Argentaria, S.A. ("BBVA") to further remove it from the fraud. Another FP AG co-conspirator personally delivered €641,582.99 to Chamsi in cash. These sums represent money provided for the Unterwasserwelt project by defrauded investors and equal exactly €1,746,279.06, the amount ordered restrained by the Dresden Local Court. Although it is unclear whether the $80,000 contained in Chamsi's U.S. bank account is the direct proceeds of his offense, such funds can be used to satisfy a future forfeiture or confiscation order issued by the German court.

## IV.    LEGAL AUTHORITY

Pursuant to 28 U.S.C. § 2467(d)(3), federal courts are authorized to issue orders to preserve property during the pendency of foreign forfeiture proceedings until receipt of an enforceable, final foreign forfeiture or confiscation judgment. *See* Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 11-342, 124 Stat. 3607 (codified as amended in 28 U.S.C. § 2467(d)(3)).[2] Section 2467(d)(3)(A) provides:

> [t]o preserve the availability of property subject to civil or criminal forfeiture under foreign law, the Government may apply for and the court may issue a restraining order at any time before or after the initiation of forfeiture proceedings by a foreign nation.

Section 2467(d)(3)(A) also requires that the U.S. restraining order be issued "consistent with subparagraphs (A), (C), and (E) of subparagraph [(d)](1) and the procedural due process protections for a restraining order under section 983(j) of title 18." 28 U.S.C. § 2467(d)(3)(A). Consequently, the district court may deny enforcement of a foreign restraining order if it finds that the order was obtained without due process, was issued by an authority that lacked subject matter jurisdiction, or was obtained by fraud. In addition, the cross-references to § 983(j) do not require that forfeiture proceedings, civil or criminal, be filed in the United States, but rather, refer to applicable foreign criminal or forfeiture proceedings initiated in the foreign country. *See* 28 U.S.C. § 2467(d)(3)(A)(ii)(II); *see also Luan v. United States*, 722 F.3d 388, 394-97 (D.C. Cir. 2013) (holding that the filing of a foreign civil forfeiture complaint is not required, but that "applicable" foreign criminal proceedings, sufficient to justify the restraint of assets indefinitely pending final forfeiture, should entail "procedural due process protections consistent with those

---

[2] On December 22, 2010, through the Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 111-342, 124 Stat. 3607 (2010), Congress amended 28 U.S.C. § 2467(d)(3) partly in response to case law limiting courts' authority under the prior iteration of the statute to freezing assets only after a foreign court had entered a final forfeiture judgment. *See In re Any and All Funds or Other Assets in Brown Bros. Harriman & Co. Account # 8870792 in the Name of Tiger Eye Inv. Ltd.*, 613 F.3d 1122 (D.C. Cir. 2010). As amended, the statute now clearly authorizes courts to issue a restraining order "at any time before or after the initiation of forfeiture proceedings by a foreign nation." 28 U.S.C. § 2467(d)(3)(A)(i) (2012).

that the filing of an American civil forfeiture complaint" would have afforded). In line with analogous procedures in a domestic civil or criminal forfeiture proceeding under 18 U.S.C. § 983(j), U.S. courts may issue an order fashioning the appropriate relief to preserve property during the pendency of foreign criminal or forfeiture proceedings.

A prerequisite for the enforcement of a foreign restraining order is certification by the Attorney General that enforcement of the order is in the "interest of justice." 28 U.S.C. § 2467(b)(2). On May 9, 2006, the Attorney General delegated authority for the certification of orders under this provision to the Assistant Attorney General for the Criminal Division. *See* Exhibit B, DOJ Order No. 2820-2006. The Assistant Attorney General's determination is a statutory requirement for enforcement of a court-issued, foreign restraining order and the decision is not subject to judicial review. *See* 28 U.S.C. § 2467(d)(3)(B)(ii) and § 2467(b)(2).

## V.    DISCUSSION

### A.    The German Restraining Order Meets the Criteria for Enforcement Under § 2467(d)(3)(A).

Section 2467 sets forth the following criteria relevant in considering a request for enforcement of a foreign restraining order: (1) whether the United States and the foreign government issuing the order are or will become parties to a formal international agreement providing for mutual forfeiture assistance, § 2467(a)(1); (2) whether the acts underlying the violation of foreign law giving rise to forfeiture would give rise to forfeiture under federal law if such acts were committed in the United States, § 2467(a)(2); (3) whether the Attorney General has determined it would be in the interest of justice to certify the order for enforcement, § 2467(b)(2); (4) whether the foreign order was issued consistent with due process, § 2467(d)(3)(A)(ii)(I); (5) whether the foreign authority had subject matter jurisdiction to issue the restraint, *id.*; and (6) whether there is any reason to believe the foreign order was obtained by

fraud, *id.*[3]   The certified German restraining order meets the relevant criteria for registration and

enforcement pursuant to § 2467 and, therefore, entry of the proposed U.S. restraining order is

both necessary and appropriate to preserve the property for eventual forfeiture in Germany.

### 1.  Agreement on Forfeiture Assistance

First, the United States and Germany are parties to a bilateral mutual legal assistance

treaty ("MLAT") that entered into force on October 8, 2009.  *See* Treaty Between the United

States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal

Matters, U.S.-Ger., Sen. Treaty Doc. 108-27, Oct. 14, 2003.  Article 1 of the MLAT provides

that the parties shall afford each other the widest measure of mutual legal assistance in criminal

matters, to include "assistance in proceedings related to immobilization and forfeiture of assets."

*Id.*, art. 1.  Under article 13 of the MLAT, the United States is obligated to assist Germany upon

information that the proceeds or instrumentalities of an offense are located in the United States

that may be forfeitable or subject to seizure under German law.  *See id.*, art. 13(1).  To the extent

permitted by federal law, the United States is bound to take action to immobilize U.S.-based

assets pending further criminal and/or forfeiture proceedings in Germany.  *See id.*, art. 13(2).

Accordingly, the first criterion for enforcement is met as the United States and Germany are

parties to an agreement authorizing forfeiture assistance.

### 2.  Dual Forfeitability

Second, the dual forfeitability requirement is satisfied because Chamsi's underlying

criminal conduct would have violated one or more U.S. criminal laws giving rise to forfeiture

---

[3] See *In re Restraint of All Assets Contained in Certain Investment Accounts at UBS Financial Services, Inc.*, 860 F. Supp. 2d 32 (D.D.C. 2012) (asserting that in considering an application for a restraining order under § 2467(d)(3), a "district court should begin with the premise that the foreign proceedings or procedures are in fact compatible with due process").  An affected party may appear in this proceeding to challenge any U.S. restraining order issued as a result of this application by making an affirmative showing that the foreign order or process has one of these defects. However, such a challenge would lack merit in this instance for the reasons discussed in Section V.A.4.

had such offenses been committed here. Specifically, Chamsi may have violated 15 U.S.C. §§ 78j(b) and 78ff (securities fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1956 (money laundering), all of which give rise to forfeiture as discussed further below.

As an initial matter, the fact that Chamsi's victim-investors may have believed (incorrectly) that they were trading on material, non-public information does not affect the dual forfeitability analysis. Theoretically, if Chamsi committed the same acts in the United States that he did in Germany, U.S. prosecutors could decline to bring charges if the victims had unclean hands because they also engaged in criminal conduct, but there would be no legal impediment to prosecuting Chamsi for the most serious offense possible, namely, defrauding the investors. As in the United States, forfeiture in Germany is intended to take away a defendant's criminal profit. Also, as in the United States, victims of crime may claim that they are entitled to a portion of forfeited property in a separate proceeding. Regardless of whether the victims of Chamsi's scheme will be allowed to recover subsequent foreign proceedings, Chamsi's ill-gotten gains are still forfeitable to the German government. Thus, the Assistant Attorney General certified that it is "in the interest of justice" to certify the German request to enforce the attached restraining order in anticipation of forfeiture or confiscation, even though the victim-investors possibly had unclean hands.[4]

---

[4] United States case law on restitution is instructive on this point in that victims with unclean hands can still be entitled to restitution, even if they paid money believing that they were participating in an illegal scheme. In *United States v. Ojeikere*, 545 F.3d 220, 221 (2d Cir. 2008), a defendant in an "advance fee" scam that tricked victims into paying fees to release large sums of money held in Nigeria challenged his sentence, which included a restitution order to pay the victims of the scheme $679,132. He argued that "the victims' hands are too dirty to claim restitution, since they all participated in what they thought was a fraudulent scheme to obtain money from Nigeria and were in effect coconspirators." *Id.* at 222. The court held that the important analysis was whether the victims were involved in the offense of conviction, which was a fraudulent scheme to obtain money from them. *Id.* It stated: "[w]hatever illegal scheme the victims thought they were involved in, it was not a scheme to lose their *own* money, which they earned fairly (as far as we know), [and] lost." *Id.* at 223 (emphasis in original). *See also United States v. Archer*, 671 F.3d 149, 171 (2d Cir. 2011) (noting that "those who 'would not have made the [payments to the defendant] had they known [about the fraudulent scheme]'" are victims). Here, even if the victims traded on confidential or inside information (which turned out to be a lie since Disney was not considering acquiring FP AG in any event), they still parted with their presumably legitimately-earned money on the basis of numerous falsehoods

Chamsi's conduct would constitute fraud if it had happened in the United States. Chamsi, in concert with the management of FP AG made a series of misrepresentations and omissions transmitted over telephonic wires, and there is evidence that the entire premise of the investment—building an underwater resort—may have been a fraud, especially since it would require much more than the €8 million in capital that Chamsi sought to raise to build such an engineering marvel.    Specifically, Chamsi lied about his identity (said he was Nathan Rothenberg), his affiliation (Rothschild), and his position (investment manager with Rothschild). He did not tell investors that his companies kept fifty percent of their contributions and he falsely stated that Disney was going to acquire FP AG.  The object of Chamsi's scheme to defraud was to obtain the investors' money, and he did so, to the tune of approximately €6.6 million. Germany is investigating Chamsi for simple fraud[5] and the victims were not involved in what will likely be the charged offense or the offense of conviction.  Fraud in connection with the sale of securities and the fraud committed by Chamsi using telephone and facsimile wires to communicate materially false information in the course of selling FP AG stock would give rise to forfeiture had it occurred in the United States. *See* 18 U.S.C. § 981(a)(1)(C).

Furthermore, Chamsi may have committed money laundering in violation of 18 U.S.C. § 1956 when he: (i) used an alias ("Karim Liyo") and a false Dutch identification card[6] to open a corporate account at Banco Caja Rural and then directed and received criminally-derived fees of €1,104,696.07 into that account from his co-conspirators at FP AG; and (ii) transmitted the

---

contained in Chamsi's pitch.

[5]  Fraud, as defined in § 263(1) of the German Criminal Code, is committed by any person who, intending to gain an "unlawful material benefit, damages the property of another . . . by pretending false facts or by distorting or suppressing true facts."  This case would be considered "especially serious" according to § 263(3) and could warrant a term of imprisonment of up to ten years because the fraud took place in a "commercial context" and caused a "major financial loss."

[6]  The use of a false national identification document likely would constitute a violation of 18 U.S.C. § 1028 had Chamsi used such an ID in the United States.

proceeds of securities fraud and/or wire fraud by sending €421,000 from his Banco Caja Rural account to his wife's account at BBVA for the purpose of concealing the illicit origin of the funds. Both securities fraud and wire fraud are specified unlawful activities for money laundering for which forfeiture is authorized. *See* 18 U.S.C. § 1956(c)(7)(A) (referring to specified unlawful activities contained in the Racketeer Influenced and Corrupt Organizations Act at § 1961(1)); *see also* § 981(a)(1)(A) (civil forfeiture of property involved in, or proceeds traceable to, a money laundering transaction); § 982(a)(1) (criminal forfeiture of the same). Therefore, the second criterion for enforcement of the German restraining order is fulfilled.

      3.    Attorney General Certification

Third, the German restraining order was certified by the Acting Assistant Attorney General on November 1, 2013. The Acting Assistant Attorney General, in certifying the order, acknowledges that she has considered the facts of the case, the foreign law, the applicable U.S. law, and the circumstances of the judiciary from where the order came, and has concluded that enforcement of the foreign restraining order pursuant to 28 U.S.C. § 2467 is "in the interest of justice." *See* Exhibit A, AAG Certification and German Restraining Order. Thus, the third criterion for enforcement is met.

      4.    Due Process

Fourth, the German restraining order was issued consistent with due process. Under German law, forfeiture is available "if an unlawful act has been committed and the principal or a secondary participant has acquired proceeds from it." *See* German Criminal Code ("GCC"), § 73. If the proceeds or instrumentalities used to commit the offense are unavailable, forfeiture may also be ordered for "a sum of money which corresponds to the value of what was obtained." GCC, § 73a. Provisional measures, such as restraining orders (known as attachments *in rem* or

freezing injunctions), are authorized during the "preliminary proceedings" against a criminal defendant, as stated in the order itself. The German prosecutor filed an application with the Dresden Local Court showing that there are "grounds to assume that the conditions have been fulfilled for forfeiture of equivalent value or for confiscation" such that "attachment *in rem* may be ordered . . . in order to secure such equivalent value." *See* German Rules of Criminal Procedure ("RCP"), § 111b(2). In this situation, § 917 of the German Code of Civil Procedure applies, which provides that "seizure is an available remedy wherever there is concern that without a writ of pre-judgment seizure being issued, the enforcement of the [future forfeiture or confiscation] judgment would be frustrated."

Here, without the restraint of Chamsi's fraudulently obtained assets or their equivalent value, a forfeiture or confiscation judgment could be left unsatisfied to the detriment of the victim-investors who would be eligible to make claims for a portion of the recovered funds. Although in the German legal system, a public prosecutor is authorized to directly order seizure in exigent circumstances under the RCP, the prosecutor in this case sought a court-authorized restraint from a neutral and impartial investigating judge not once, but twice, the second time coming after the discovery of the U.S. bank account. The initial restraining order and amended September 9, 2013, order were issued without a prior hearing of the accused in accordance with § 33 of the RCP; however, appeals against the order on the merits or for a modification of its terms are permitted, to include a hearing at the Dresden Local Court. Chamsi likely will not contest the order and subject himself to the jurisdiction of the court because he is a fugitive, but should he choose to do so, he may challenge the restraint under § 33 of the RCP and/or § 111d, which allows a defendant to show that he needs the restrained assets to pay for his legal defense or the maintenance of his family (although Chamsi's wife, Sonia Chamsi, is also a suspect).

11

Accordingly, the fourth criterion for enforcement is satisfied.

      5.    <u>Subject Matter Jurisdiction</u>

Fifth, the restraining order was issued by a court of competent jurisdiction. The Dresden Local Court is the proper authority to issue the restraining order in this matter. It is a criminal court with subject matter jurisdiction over the Unterwasserwelt investigation on the basis that it is the local court of the State Criminal Police of Saxony, the investigating German police unit. The Dresden Local Court has properly issued numerous domestic restraining orders and arrest warrants against Chamsi and another principal suspect.

      6.    <u>Absence of Fraud</u>

Finally, the United States has no reason to believe that the September 9, 2013, restraining order was obtained by fraud. As such, ample justification exists for the registration and enforcement of the order in the United States.

    **B.    This Court Should Act to Enforce the German Restraining Order by Issuing a Restraining Order in a Manner Consistent with 18 U.S.C. § 983(j)(1).**

Pursuant to the Preserving Foreign Criminal Assets for Forfeiture Act, 28 U.S.C. § 2467(c)(2)(B) and § 2467(d)(3)(A) authorize the District Court for the District of Columbia to enter a restraining order to preserve the availability of property subject to civil or criminal forfeiture under foreign law. The German restraining order reflects the intention of German prosecutors to seek the forfeiture of assets in connection with the criminal prosecution of Chamsi and his associates. Should Chamsi remain a fugitive and never stand trial in Germany, the prosecutor may pursue non-conviction based forfeiture. In either scenario, the United States seeks to guarantee the effectiveness of any future forfeiture order against Chamsi.

Consequently, applying the language of § 2467(d)(3)(A) and structure under

18 U.S.C. § 983(j)(1)(A), this Court possesses the authority to issue an order—consistent with the German restraining order—to "preserve the availability of property . . . subject to forfeiture" for the duration of the German forfeiture proceedings. *See* 28 U.S.C. § 2467(d)(3)(A) (specifying that the district court may enter a restraining order at any time before or after the initiation of foreign forfeiture proceedings). As such, this Court should recognize the Dresden Local Court's September 9, 2013, order and enforce it according to its terms by prohibiting Chamsi and all others from in any way dealing with his assets located in the United States. *See* Exhibit A, AAG Certification and German Restraining Order. As to the bank account at the financial institution referenced herein, *see* Section II, the United States will serve any order issued by this Court upon the relevant institution and freeze the listed asset in place.

## VI.   CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court enforce the attached German restraining order, consistent with U.S. treaty obligations under the relevant MLAT, by entering the attached proposed order pursuant to this Court's authority under 28 U.S.C. § 2467(d)(3)(A), (d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A). The United States anticipates assistance from the German Federal Office of Justice in providing notice and a copy of any order issued by this Court to Solayman Chamsi once the asset is restrained as requested in the pending mutual legal assistance request.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND MONEY
   LAUNDERING SECTION

By:      *Marybeth Grunstra*

A.J. DE KLUIVER (LA Bar #20163)
Assistant Deputy Chief
MARYBETH GRUNSTRA (NY Bar #4886362)
Trial Attorney

U.S. Department of Justice
Criminal Division
Asset Forfeiture and Money
   Laundering Section
1400 New York Avenue NW, 10100
Washington, DC  20530
Telephone:   (202) 514-1263
Fax:         (202) 616-2547

Attorneys for Applicant
UNITED STATES OF AMERICA

14

Exhibit A

AAG Certification and German Restraining Order



**U.S. Department of Justice**

Criminal Division

*Assistant Attorney General*                    *Washington, D.C. 20530*

## ASSISTANT ATTORNEY GENERAL DECISION

**DECISION:**

In accordance with 28 U.S.C. § 2467(b)(2) and the Attorney General's delegation of authority, Number 2820-2006, to the Assistant Attorney General for the Criminal Division, I hereby find that it is in the interest of justice to CERTIFY for enforcement the attached restraining order, issued by the Dresden Local Court in Germany, in Court File No. 270 Gs 2039/13, on September 9, 2013, restraining bank accounts at a U.S. financial institutions.

_Mythili Raman_

**Mythili Raman**
**Acting Assistant Attorney General**
**Criminal Division**

11/1/13
**Date**



**Ausfertigung**



Amtsgericht Dresden

Ermittlungsrichter

Aktenzeichen: 270 Gs 2039/13
Staatsanwaltschaft Dresden 106 Js 54361/09

# BESCHLUSS

In dem Ermittlungsverfahren gegen

Solayman Chamsi, geboren am 08.08.1975, wohnhaft: Eichenstraße 7 in Erkrath

wegen Betruges

ergeht  am 09.09.2013
durch das Amtsgericht Dresden - Ermittlungsrichter -

nachfolgende Entscheidung:

Der Beschluss des Amtsgerichts Dresden vom 29.05.2013, Az: 270 Gs 2039/13, mit dem der dingliche Arrest in Höhe von 1.746.279,06 EUR in das Vermögen des Beschuldigten angeordnet wurde, wird im Anschluss an die im Rahmen der am 04.09.2013 durchgeführten Durchsuchungsmaßnahmen festgestellten Vermögenswerte dahingehend konkretisiert, dass sich der dingliche Arrest auch auf das im Folgenden genannte, sowie alle weiteren existierenden Konten erstreckt:

**J.P. Morgan Chase & Co.**
**San Antonio, TX 782659754**
**PO Box 659754**
**Konto-Nummer 000000468419499**

Vollmers
Richterin am Amtsgericht

Ausgefertigt am 09.09.2013

Salomon, Urkundsbeamtin

Seite  1

**Ausfertigung**



**Amtsgericht
Dresden**

**Geschäftszeichen:** (Bitte stets angeben)

2 Ю C/ 2039, 13

Staatsanwaltschaft Dresden

106 Js 54361/09

Telefon-Nr.: 0351 4460
Telefax-Nr.:

Dresden, 2 9. MAI 2013

# Beschluss

1. Gem. §§ 111b Abs.2 und Abs. 5, 111d, 111e Abs.1 StPO i.V.m. §§ 73 Abs.1 S.2, 73a, § 263 Abs. 1, Abs. 3 StGB wird - ohne vorherige Anhörung des Beschuldigten gem. § 33 Abs. 4 StPO - zur Sicherung der den Verletzten aus den Straftaten erwachsenen zivilrechtlichen Ansprüche für den Freistaat Sachsen, vertreten durch das Staatsministerium der Justiz und für Europa, dieses vertreten durch die Staatsanwaltschaft Dresden und diese vertreten durch den Leitenden Oberstaatsanwalt in Dresden

-Gläubiger-

der dingliche Arrest in Höhe von 1.746.279,06 EUR in das Vermögen des Beschuldigten

**Solayman Chamsi**
**geb. 08.08.1975**
**whft. Erkrath, Eichenstraße 7**

**alias Karim Liyo**
**geb. 07.11.1977**

**alias Jean Suly**

- Schuldner -

angeordnet.

2. Durch Hinterlegung eines Geldbetrages in Höhe von 1.746.279,06 EUR wird die Vollziehung des Arrestes gehemmt und der Beschuldigte berechtigt, die Aufhebung des vollzogenen Arrestes zu beantragen (§ 111d Abs.2 StPO i.V.m. §§ 923, 934 Abs.1 ZPO).

Gründe:

106 Js 54361/09

Seite 1

Der Mitbeschuldigte Claus-Michael Schmidt ist Geschäftsführer der am 05.01.2007 durch ihn, den Mitbeschuldigten Dr. Klaus Butt sowie die Dr. Busch Bauprojektentwicklungs- und Projektmanagementgesellschaft mbH (Dr. Busch GmbH) mit Sitz in der Wasastraße 6 in 01219 Dresden gegründeten UWW Unterwasserwelt Projektentwicklungs GmbH (UWW GmbH). Geschäftsgegenstand der UWW GmbH ist die Planung, Vorbereitung und Realisierung des touristischen Großprojekts "Unterwasserwelt" am Geiseltalsee in Braunsbedra (bei Leipzig) mit einem Investitionsvolumen von insgesamt ca. 30 Millionen EUR und einem darauf entfallenen Eigenkapitalanteil von ca. 8 Millionen EUR. Bereits unmittelbar nach Gründung der Gesellschaft, nämlich am 21.03.2007, wurden die Gesellschaftsanteile durch Vermittlung des Mitbeschuldigten Dr. Kahl auf die in der Schweiz (Kanton Zürich) ansässige und mit einem Grundkapital von 100 Aktien zum Nennwert von 1.000 EUR ausgestattete FP Freizeitprojekte AG (FP AG) übertragen. Im Gegenzug wurde die Mehrheit der Aktien der FP AG auf die Mitbeschuldigten sowie die Dr. Busch GmbH übertragen übertragen. Dabei war das Aktienkapital der FP AG noch kurz vor der Übertragung der Gesellschaftsanteile in 10.000.000 Aktien zu nominell 0,01 CHF aufgeteilt und die Gesellschaft somit zu einem "penny - stock" umgewandelt worden. Nach Abschluss der Transaktion verfügte der Beschuldigte Schmidt über 2.328.934, der Mitbeschuldigte Dr. Butt über 2.400.000, der Mitbeschuldigte Dr. Busch über 408.333, die Dr. Busch GmbH über 2.000.000 und die DEKA Holding AG, deren alleiniger Aktionär und Vorstand der Mitbeschuldigte Dr. Kahl war, über weitere 2.500.000 Aktien der FP AG. Insgesamt hielten die vorgenannten Mitbeschuldigten direkt oder indirekt somit ca. 80 % des Grundkapitals der FP AG. Um die FP AG bzw. die UWW GmbH mit dem für die Realisierung des Projekts "Unterwasserwelt" erforderlichen Eigenkapital auszustatten, wurde die Aktie der FP AG dann am 15. Mai 2007 auf Veranlassung der Beschuldigten und unter Einschaltung der Peter Koch Wertpapierhandelsbank über das Handelssystem Xontro zum Freiverkehr an der Frankfurter Wertpapierbörse zugelassen.

Da jedoch im Anschluss an den "Börsengang" kaum nennenswerte Umsätze im Wert FP AG zu verzeichnen waren, bestand die Notwendigkeit, eine Vertriebsgesellschaft einzuschalten, um auf diese Weise den Umsatz im Wert FP AG anzukurbeln und so die für die Realisierung des Projekts erforderliche Kapitalisierung der FP AG sicherzustellen. Auf Vermittlung des Mitbeschuldigten Dr. Kahl kontaktierte der Mitbeschuldigte Schmidt sodann einen Jean Suly von der in Alicante/Spanien ansässigen "L. Bienestar S.L." sowie "Financial Service c.b. S.L.", letztere jeweils vertreten durch Jean Suly. Nachdem sich der Beschuldigte Schmidt durch ein persönliches Treffen in einem Büro in Palma de Mallorca von der Existenz Sulys sowie davon überzeugt hatte, dass dieser über die notwendigen Rahmenbedingungen für die in Aussicht genommenen Akquisetätigkeiten verfügte, kam es sodann am 19.02./23.02. 2008 zur Unterzeichnung einer "Promotionsvereinbarung" zwischen den Verantwortlichen der FP AG und der "L. Bienestar S.L." bzw. der "Financial Service c.b. S.L.". Gegenstand der Verträge war die Erbringung von Promotionsdienstleistungen zur Werbung und Gewinnung von Interessenten für den Erwerb von Aktien der FP Freizeitprojekte AG. Für den Fall, dass die von der "L. Bienestar S.L." bzw. der "Financial Service c.b. S.L." angesprochenen Personen Aktien der FP AG kauften, sollten die Vertriebsgesellschaften ein Honorar in Höhe von 50 % des erzielten Netto - Verkaufsumsatzes (abzüglich der jeweiligen, bei der Peter Koch GmbH angefallenen Kosten) erhalten.

In der Folgezeit wurden im Wege des Telefonmarketing (sog. "cold - calling") - u.a. unter Nutzung eines Sekretariatsservices der Excellent Business Centers GmbH in 60327 Frankfurt/Main -diverse Geschädigte von - sich u.a. als Mitarbeiter des renommierten Bankhauses Rothschild ausgebenden - Werbern unter Weitergabe von bewusst wahrheitswidrigen Insiderinformationen, etwa dass angeblich ein Einstieg von World Disney bei der FP AG unmittelbar bevorstünde, zum Kauf von Aktien der FP AG veranlasst, und flössen über die UWW GmbH bzw. den Beschuldigten Schmidt, der für sich bzw. die weiteren Mitbeschuldigten über ein Poolkonto die jeweils benötigten Aktien zur Verfügung stellte und die eingehenden Gegenwerte vereinnahmte, bis Oktober 2008 an die Vertriebsgesellschaften Provisionen in Höhe von insgesamt 3.722.892,44 EUR.

Ausweislich der von den Vertriebsgesellschaften unmittelbar an die FP AG gerichteten und anschließend an den Beschuldigten Schmidt weitergereichten Rechnungen waren die fälligen

Provisionszahlungen dabei überwiegend nicht an die "L. Bienestar S.L." bzw. die "Financial Service c.b. S.L.", sondern unter Angabe - wiederum - ausländischer Kontoverbindungen an Personen zu leisten, die (angeblich) für die Akquise verantwortlich gewesen waren. Aufgrund der Auswertung der beigezogenen Bankunterlagen und der dabei festgestellten Zahlungsströme besteht jedoch der dringende Verdacht, dass man sich seitens der "L. Bienestar S.L." bzw. der "Financial Service c.b. S.L." insoweit diverser, auf unterschiedlichen Verteilebenen tätiger Finanzagenten bediente, um so die im Zuge des betrügerischen Aktienvertriebs erlangten Vermögensvorteile durch fortlaufende Geldtransfers sowie Einschaltung von Strohmännern zu verschleiern. Am Ende erfolgten dann jeweils regelmäßig Barabhebungen bzw. die Einlösung von Barschecks. Insoweit besteht der dringende Verdacht, dass diese Beträge - wie bei Finanzkaussells allgemein üblich - wieder an den Initiator des Aktienvertriebs und damit an "Jean Suly" zurückflossen.

Es besteht aufgrund der bisherigen Ermittlungen der Verdacht, dass es sich bei Jean Suly, dem Hauptverantwortlichen des Aktienvertriebs, um den Beschuldigten Solayman Chamsi alias Karim Liyo handelt.

Nach Angaben des Zeugen Martin Schild, der als Vermögensverwalter im Auftrag seiner Kunden Aktien der FP Freizeitprojekte AG für insgesamt ca. 2,6 Mio EUR erwarb, wurde er zu diesem Investment fernmündlich von einer sich als "Nathan Rothenberg, Investor Manager der Rothschild Bank" ausgebenden Person und der angeblich streng vertraulichen Insiderinformation, dass vermeintlich eine feindliche Übernahme in dem Wert FP AG bevorstünde, kontaktiert und wurde ihm in diesem Zusammenhang anschließend auch ein sog. "Geheimhaltungsvertrag" per Fax übermittelt. Die Durchsuchung und anschließende Vernehmung des Zeugen Herrmann, des Inhabers des für die Übermittlung des Geheimhaltungsvertrages in diesem Fall genutzten Faxanschlusses, ergab, dass sich dieser wegen finanzieller Schwierigkeiten aufgrund Vermittlung des ebenfalls Beschuldigten El Schalchi dazu bereit erklärt hatte, als telefonischer Ansprechpartner für die deutschen Kunden eines ausländischen Finanzdienstleisters zu fungieren, indem er deren Kundendaten aufnahm und dann anschließend nach Spanien weiterleitete und auch dem Beschuldigten El Schalchi hierfür seinen Telefonanschluss zur Verfügung stellte. Bei einer der in diesem Zusammenhang wiederholt angerufenen Telefonnummern handelte es sich dabei um die spanische Rufnummer 0034 663 834 488, welche von der ebenfalls Beschuldigten Sonia Chamsi, der Ehefrau des Beschuldigten Solayman Chamsi und geschäftsführenden Gesellschafterin der mit dem Geschäftszweck "Telefonie" im Handelregister von Alicante eingetragenen "Locutorio Bienestar S.L.", anlässlich der Eröffnung eines Kontos bei der "Banco Bilbao Vizcaya Argentaria S.A." als telefonische Erreichbarkeit angegeben wurde. Nämliche spanische Rufnummer war ausweislich einer bei dem Mitbeschuldigten Schmidt sichergestellten Notiz aber auch eine von dessen Kontaktnummern zu Jean Suly.

Formeller Inhaber der auf den Rechnungen der "L. Bienestar S.L." sowie der "Financial Service c.b. S.L." angegebenen - identischen - Kontoverbindung Nr. 4456529413 ist nach der Auskunft der kontoführenden Banco Caja Rural ausweislich einer anlässlich der Kontoeröffnung vorgelegten niederländischen "Identitätskaart" der - ebenfalls - marokkanische Staatsangehörige Karim Liyo. Im Zuge des Erwerbs der Gesellschaftsanteile an der "Locutorio Bienestar S.L." durch die Beschuldigte Sonia Chamsi am 06.07.2004 wies sich diese nach der notariellen Urkunde als nach deutschem Recht mit Karim Liyo verheiratet aus. Ausweislich der eingeholten Registerauskunft ist die Beschuldigte Sonia Chamsi zwar seit dem 03.02.2002 verheiratet, allerdings nicht mit Karim Liyo, sondern mit Solayman Chamsi. Es besteht daher der dringende Verdacht, dass Solayman Chamnsi insoweit auch unter dem Namen bzw. den Personalien des Karim Liyo aufgetreten ist bzw. gehandelt hat.

Auf dem Konto Nr. 4456529413 bei der Banco Caja Rural gingen im Tatzeitraum Provisionszahlungen in Höhe von insgesamt 1.104.696,07 EUR ein, von denen dann wiederum 421.000 EUR auf das Konto Nr. 0182 1414 01 0291506599 der Beschuldigten Sonia Chamsi bei der "Banco Bilbao Vizcaya Argentaria S.A." überwiesen wurden. Weitere 641.582,99 EUR an Provisionszahlungen vereinnahmte der Beschuldigte Solayman Chamsi von dem Mitbeschuldigten Schmidt in bar.

Dass der Beschuldigte Solayman Chamsi verdächtig ist, unter dem Aliasnamen Jean Suly bzw. Karim Liyo gemeinsam mit der Beschuldigten Sonia Chamsi über die "L. Bienestar S.L." bzw. die "Financial Service c.b. S.L." den betrügerischen Vertrieb der Aktie der FP Freizeitprojekte AG gesteuert zu haben, belegt auch der Umstand, dass der Beschuldigte Schmidt auf einer ihm vorgelegten Lichtbildmappe den Beschuldigten Solayman Chamsi eindeutig als den ihm bekannten "Suly" und die Beschuldigte Sonia Chamsi als dessen Frau identifizierte.

Nach allem besteht der Verdacht, dass durch die Beschuldigten Solayman und Sonia Chamsi, um sich eine dauerhafte Einnahmequelle zu verschaffen, Interessenten unter Vorspiegelung wahrheitswidriger Insiderinformationen zum Kauf von Aktien der FP AG im Gesamtwert von über ca. 6,6 Mio EUR veranlasst wurden, und die Interessenten, da 50% des Verkäuferlöses an den Aktienvertrieb weiterzuleiten waren und demzufolge von vornherein nicht für die Kapitalisierung der FP AG und somit für die Realisierung des Projekts "Unterwasserwelt" zur Verfügung standen, - wie die Beschuldigten Chamsi wussten und wollten, zumindest aber für möglich hielten und billigend in Kauf nahmen - ein von Anfang an unsicheres und somit minderwertiges Investment eingingen. Das Projekt "Unterwasserwelt" wurde daher auch bis zum heutigen Tag nicht realisiert.

Das Verhalten der Beschuldigten Solayman und Sonia Chamsi ist strafbar als Betrug gemäß § 263 Abs. 1, Abs. 3 StGB.

Durch den betrügerischen Vertrieb der FP Aktie erlangte Solayman Chamsi insgesamt 1.104.696,07 EUR im Zeitraum vom 05.03.2008 bis 27.10.2008 in 39 Tranchen durch Überweisungseingang auf dem Konto Nr. 4456529413 bei der Banco Caja Rural. Weitere insgesamt 641.582,99 EUR wurden ihm von dem Mitbeschuldigten Claus-Michael Schmidt in bar übergeben an 5 Terminen zwischen dem 02.07.2008 und 23.10.2008. Die einzelnen Beträge sind identisch mit Rechnungen der Financial Service c.b. S.L. (Zitat: „für Marketing und Promotiondienstleistungen"). Diese Beträge wurden auf den Vertriebsrechnungen als Barzahlung von Suly (Solayman Chamsi, bzw. seiner Frau Sonia Chamsi) quittiert. Solayman Chamsi erlangte insgesamt also 1.746.279,06 EUR. [1]

Es ist davon auszugehen, dass das Erlangte beim Beschuldigten nicht mehr individuell vorhanden ist, weshalb er nach § 73a StGB Wertersatz zu leisten hat.

Es sind dringende Gründe für die Annahme vorhanden, dass zivilrechtliche Ansprüche der Verletzten gem. §§ 73 Abs.1 S.2, 73a StGB vorliegen.

Der dingliche Arrest zur Sicherung dieser zivilrechtlichen Ansprüche der Verletzten ist anzuordnen, da zu befürchten ist, dass der Beschuldigte bei umfassender Kenntnis der Sach- und Rechtslage alles tun wird, sein Vermögen zu verschieben, um die spätere Vollstreckung des Ansprüche der Verletzten zu vereiteln oder wesentlich zu erschweren (§ 111d Abs.2 StPO i.V.m. § 917 ZPO).

Von Anfang an hat Solayman Chamsi sowohl durch Ausnutzung seiner verschiedenen Identitäten als auch durch das Dirigieren der Zahlungsflüsse versucht zu verschleiern, wem die Gelder tatsächlich zufließen.

Während die Provisions-Rechnungen von den Vertriebsgesellschaften "L. Bienestar S.L." bzw. die "Financial Service c.b. S.L." gestellt worden waren, ist dem Beschuldigten Schmidt aufgegeben worden, die in Rechnung gestellten Beträge auf das o. g. Konto Nr. 4456529413 bei der Banco Caja Rural zu leisten. Dabei waren zwar als Empfänger entweder die "L. Bienestar S.L." oder die "Financial Service c.b. S.L." für (Teil-) Zahlungen i. H. v. 265.053,95 EUR bzw. 158.145,69 EUR angegeben worden, tatsächlich ist jedoch Karim Liyo bei der Bank als

---

[1] Quelle: Sachakte Teil 1 Band 4

Kontoinhaber registriert. Auch „Karim Liyo" ist nach dem gegenwärtigen Stand der Ermittlungen jedoch nur ein Aliasname des Solayman Chamsi.

Ein Betrag i. H. v. 681.496,43 EUR, der an dieses Konto aufgrund der Rechnungsstellungen der Vertriebsfirmen angewiesen wurde, sollte gemäß der Überweisung dem Karim Liyo zukommen. Begründet wurde dies damit (wie bereits dargestellt), dass Zahlungen direkt an Personen zu leisten sind, die (angeblich) für die Akquise verantwortlich gewesen waren.
So wurde von Anfang an der Eindruck vermieden, dass Jean Suly (wie sich Solayman Chamsi gegenüber dem Beschuldigten Schmidt ausgab) der tatsächliche Empfänger der Zahlungen ist.

In der Folge hat Solayman Chamsi weitere Verschleierungen vorgenommen, indem er von dem o. g. Konto Nr. 4456529413 bei der Banco Caja Rural 123.482,85 EUR an seine Ehefrau Sonia Chamsi verschoben hat.

Die Besorgnis, dass Solayman Chamsi alles tun wird, sein Vermögen zu verschieben, um die spätere Vollstreckung des Anspruchs der Verletzten zu vereiteln oder wesentlich zu erschweren, kann bereits aus der Art und Durchführung der vorgeworfenen Straftat geschlossen werden. Dies ist insbesondere dann der Fall, wenn bei der Vollstreckung der Ansprüche der Verletzten mit der Leistung von Wertersatz zu rechnen ist. Von einem Beschuldigten, der sich einen Vermögensvorteil durch eine Straftat verschafft hat, kann allgemein nicht angenommen werden, dass er untätig bleibt, wenn ihm die Gefahr droht, dass als Ersatz ein ebenso hoher Geldbetrag für verfallen erklärt wird.

Der Arrest ist angesichts der Schwere der Tat und dem Tatvorwurf gegenüber dem Beschuldigten auch verhältnismäßig.

Gegen diesen Beschluss ist das Rechtsmittel der Beschwerde zulässig. Unabhängig davon steht dem Beschuldigten bei einem ihm nach Vollziehung der Maßnahme verbleibenden Nachteil das Recht einer nachträglichen Anhörung nach § 33 Abs. 2 und 3 StPO beim Amtsgericht Dresden zu.


gez. Vollmers
Richterin am Amtsgericht

**Richter(in)**
**am Amtsgericht**

Ausgefertigt
Dresden, den 29. MAI 2013

FREISTAAT
SACHSEN

106 Js 54361/09

Certified Translation from the German into the English Language

[Free State of Saxony *** Dresden Local Court ***]

Execution

Dresden Local Court

Investigating Judge

File reference:  270 Gs 2039/13
Dresden Department of Public Prosecution 106 Js 54361/09

**RULING**

The following ruling is rendered by the Dresden Local Court – Investigating Judge - in the preliminary proceedings regarding:

Solayman Chamsi, born on: 08 August 1975, resident in: Eichenstraße 7 in Erkrath

on charges of fraud

on 9th September 2013:

Following the determination of the assets in the context of the search measures carried out on 4th September 2013, the ruling by Dresden Local Court of 29th May 2013, reference no.: 270 Gs 2039/13 issuing a freezing injunction regarding the assets of the accused in the amount of EUR 1,746,279.06 is hereby specified in more detail with regard to the fact that the said freezing injunction shall also refer to the account specified below as well as to all further existing accounts:

**J.P. Morgan Chase & Co.**
San Antonio, TX 782659754
PO Box 659754
Account number: 000000468419499

Vollmers
Judge at the Local Court

Executed on 9th September 2013

[handwritten signature]
Salomon, Certifying Clerk

[Free State of Saxony *** Dresden Local Court ***]

[Translator's confirmation: I hereby certify the above translation of the document submitted to me as a copy in the German language to be correct and complete.

Certified Translation from the German into the English Language

Execution                    [Seal]

Dresden Local Court

File reference: (Please always quote this number.)
    270 Gs 2039/13

Phone: 0351 4460
Fax:

Dresden Department of Public Prosecution
106 Js 54361/09

Dresden, 29th May 2013

## Ruling

1. In accordance with Art. 111b Paragraph 2 and Paragraph 5, 111d, 111e Paragraph 1 StPO [Code of Criminal Procedure] in conjunction with Art. 73 Paragraph 1 Sentence 2, 73a, Art. 263 Paragraph 1, Paragraph 3 StGB [German Penal Code] a freezing injunction regarding the assets of the accused

    Solayman Chamsi
    Born on 8th August 1975
    Resident in Erkrath, Eichenstraße 7

    alias Karim Liyo
    born on 7th November 1977

    alias Jean Suly

    -Debtor-

    in the amount of EUR 1,746,279.06 is granted without a prior hearing of the accused in accordance with Art. 33 Paragraph 4 StPO [Code of Criminal Procedure] in order to secure the civil claims arising to the injured parties for the Free State of Saxony, represented by the Ministry of Justice and for Europe, represented by the Dresden Department of Public Prosecution which is represented by the senior public prosecutor in Dresden

    -Creditor-.

2. As a result of the submission of an amount of money totalling EUR 1,746,279.06 the execution of the injunction can be stopped and the accused is then entitled to request the suspension of the executed injunction (Art. 111d Paragraph 2 StPO in conjunction with Art. 923, 934 Paragraph 1 ZPO [Code of Civil Procedure]).

**Reasons:**

106 Js 54361/09

Certified Translation from the German into the English Language

The co-accused Claus Michal Schmitt is the managing director of UWW Unterwasserwelt Projektentwicklungs GmbH (UWW GmbH) established by him, the co-accused Dr. Klaus Butt and by Dr. Busch Bauprojektentwicklungs- und Projektmanagementgesellschaft mbH (Dr. Busch GmbH) with registered offices in Wasastraße 6 in 01219 Dresden on 5th January 2007. The business objective of UWW GmbH comprises the planning, implementation and realisation of the large-scale "Underwater World" tourism project at "Geiseltalsee" lake in Braunsbedra (near Leipzig) with an investment volume of approximately EUR 30 million and an equity share regarding this totalling approximately EUR 8 million. As early as immediately after the establishment of the company, i.e. on 21 March 2007, the business shares were transferred to FP Freizeitprojekte AG (FP AG), which has its registered offices in Switzerland (Canton of Zurich) and is endowed with a share capital of 100 shares having a nominal value of EUR 1,000, through the mediation of the co-accused Dr. Kahl. In return for this, the majority of the shares in FP AG was transferred to the persons co-accused and to Dr. Busch GmbH. In this context, the share capital of FP AG had been divided into 10,000,000 shares having a nominal value of CHF 0.01 shortly before the transfer of the shares and, as a result, the company was converted into a "penny stock". After the conclusion of the transaction, the accused Schmidt held 2,328,934 shares, the co-accused Dr. Butt held 2,400,000 shares, the co-accused Dr. Busch held 408,333, Dr. Busch GmbH held 2,000,000 shares and DEKA Holding AG whose sole shareholder and executive the co-accused Dr. Kahl was held a further 2,500,000 shares in FP AG. As a result, the persons co-accused specified above directly or indirectly held approximately 80% of the share capital of FP AG. In order to endow FP AG or UWW GmbH with the equity required for the implementation of the "Underwater World" project, the shares of FP AG were admitted to the open market of the Frankfurt Stock Exchange via the Xontro trading system on 15th May 2007 at the instigation of the persons accused and by using the services of Peter Koch Wertpapierhandelsbank.

Since, however, hardly any noteworthy sales in the FP AG security were recorded following the "initial public offering", a sales company had to be called in order to boost sales in the FP AG security and provide FP AG with the capitalisation necessary for the implementation of the project in this way. Through the mediation of the co-accused Dr. Kahl, the co-accused Schmidt then contacted a person called Jean Suly from "L. Bienestar S.L." and "Financial Service c.b. S.L." based in Alicante/Spain, with these latter companies each being represented by Jean Suly. After the accused Schmidt had convinced himself of the existence of Suly and of the fact that this person fulfilled the required framework conditions for the acquisition activities envisaged at a meeting at his office in Palma de Mallorca, a "promotion agreement" was signed by the competent persons at FP AG and "L. Bienestar S.L." and of "Financial Service c.b. S.L." on 19th February and 23rd February 2008. The object of these contracts included the provision of promotion services to solicit and obtain parties interested in the acquisition of shares in FP Freizeitprojekte AG. If the persons contacted by "L. Bienestar S.L." and "Financial Service c.b. S.L." bought shares in FP AG, the sales companies were to receive a fee of 50% of the net sales turnover achieved (less the respective costs incurred by Peter Koch GmbH).

Afterwards, various injured parties were prompted to buy shares in FP AG by sales promoters, who e.g. posed as employees of the renowned Rothschild Bank, in the context of phone marketing (so-called "cold calling"), e.g. by using a secretarial service offered by Excellent Business Centers GmbH in 60327 Frankfurt am Main, and who consciously passed on incorrect information, such as that World Disney was allegedly about to invest in the company. As a result, commission fees totaling EUR 3,722,892.44 were paid to the sales companies until October 2008 via UWW GmbH and the accused Schmidt, who provided the respective required shares to himself and to the other persons co-accused via a pool account and who collected the proceeds agreed on.

As shown in the invoices which were directly issued to FP AG by the sales companies and afterwards forwarded to the accused Schmidt, the commission fees which had fallen due largely had to be paid to persons who were (allegedly) responsible for the acquisition by – again – specifying foreign bank account details instead of to "L. Bienestar S.L." and "Financial Service c.b. S.L." in this context.

Certified Translation from the German into the English Language

As a result of the analysis of the banking documents collected and the payment streams ascertained in this process, there is the strong suspicion that "L. Bienestar S.L." and "Financial Service c.b. S.L." employed various financial agents operating at various distribution levels in order to conceal assets obtained in the context of the fraudulent sale of shares through constant transfers of money and by calling in dummies. At the end of this chain, cash withdrawals were regularly effected or personal cheques were cashed in. In this respect, there is the strong suspicion that these amounts were returned to the party that had initiated the sale of the shares and, as a result, to "Jean Suly" – as is usually the case in financial carousels.

Based on the investigations carried out so far it is suspected that Jean Suly, the main party responsible for the sale of the shares, is the accused Solayman Chamsi aka Karim Liyo.

According to information provided by the witness Martin Schild, who, as an asset manager, acquired shares in FP Freizeitprojekte AG at a price of, in total, approximately EUR 2.6 million on behalf of his clients, he was contacted in a phone call regarding this investment by a person posing as "Nathan Rothenberg, Investment Manager of Rothschild Bank" and was given the allegedly strictly confidential insider information that it was supposed that a hostile takeover regarding the FP AG security was pending and a so-called "confidentiality agreement" was forwarded to him via fax in this respect. The search and subsequent interview of the witness Herrmann, the owner of the fax connection used for the transmission of the confidentiality agreement in this case, showed that the said person had agreed to operate as the phone contact for the German customers of a foreign financial service provider by recording their customer data and forwarding such data to Spain afterwards and that he also provided his telephone connection to the accused El-Schalchi to this end because he was in financial difficulties. One of the phone numbers which were repeatedly called in this connection was the Spanish phone number 0034 663 834 488, which was specified as a phone contact number by Sonia Chamsi (who is also an accused party), wife of the accused Solayman Chamsi and managing partner of the "Locutorio Bienestar S.L." registered in the commercial register of Alicante with the business objective of "telephony services", on the occasion of the opening of an account with "Banco Bilbao Vizcaya Argentaria S.A.". As was substantiated by a note seized from the co-accused Schmitz, the said Spanish phone number was also one of the phone numbers for his contacts with Jean Suly.

According to information provided by the bank keeping the account, Caja Rural, the formal owner of the – identical – banking account no. 4456529413 specified on the invoices by "L. Bienestar S.L." and "Financial Service c.b. S.L." is Karim Liyo who is – also – a Moroccan citizen as substantiated in a Dutch "Identitätskaart" provided on the occasion of the opening of the account. According to the notarised deed in the context of the acquisition of the shares in "Locutorio Bienestar S.L." by the accused Sonia Chamsi on 6th July 2004, the said person furnished proof of her identity as being married to Karim Liyo according to German law. According to the information obtained from the register, the accused Sonia Chamsi has been married since 3rd February 2002 – however, she is not married to Karim Liyo but to Solayman Chamsi. Therefore, there is the strong suspicion that Solayman Chamsi also appeared or acted under the name and personal particulars of Karim Liyo in this respect.

In the period during which the offences were committed, commission fee payments of in total EUR 1,104,696.07 were received in the account no. 4456529413 kept at Banco Caja Rural and an amount of EUR 421,000 thereof was remitted to the account no. 0182 1414 01 0291506599 kept by the accused Sonia Chamsi at "Banco Bilbao Vizcaya Argentaria S.A.". Furthermore, the accused Solayman Chamsi collected commission fee payments totalling EUR 641,582.99 from the co-accused Schmidt in cash.

106 Js 54361/09

Certified Translation from the German into the English Language

The fact that the accused Solayman Chamsi is suspected of having controlled the fraudulent sale of the shares in FP Freizeitprojekte AG using the aliases of Jean Suly and Karim Liyo together with the accused Sonia Chamsi through "L. Bienestar S.L." and "Financial Service c.b. S.L." is also confirmed by the fact that the accused Schmidt clearly identified the accused Solaymian Chamsi, who the said witness knew as "Suly", and the accused Sonia Chamsi as his wife in a folder of photographs presented to him.

After all, there is the suspicion that the interested parties were prompted to buy shares in FP AG having a total value of approximately EUR 6.6 million by the accused Solayman and Sonia Chamsi with the intention of establishing a lasting source of income for themselves by presenting false insider information and that the interested parties made an investment which was insecure and, as a result, of low value right from the outset in view of the fact that 50% of the proceeds from the sales had to be paid over to the company selling the shares and were, as a result, not available for the capitalisation of FP AG and, as a result, for the implementation of the "Underwater World" project – a fact which the accused Solayman and Sonia Chamsi were aware of and which they aimed at or at least thought possible and which they accepted approvingly. For this reason, the "Underwater World" project has not been implemented to this day.

The conduct of the accused Solayman and Sonia Chamsi is liable to prosecution as fraud according to Art. 263 Paragraph 1 and Paragraph 3 StGB [German Penal Code].

As a result of the fraudulent sale of the FP share, Solayman Chamsi gained in total EUR 1,104,696.07 in 39 tranches through the receipt of remittances in the account no. 4456529413 kept at Banco Caja Rural during the period from 5th March 2008 to 27th October 2008. A further amount of in total EUR 641,582.99 was handed to him in cash by the co-accused Claus-Michael Schmidt on in total 5 dates between 2nd July 2008 and 23rd October 2008. The individual amounts are identical with the invoices by Financial Service c.b. S.L. (quotation: "for marketing and promotion services"). These amounts were confirmed as cash payments by Suly (Solayman Chamsi and/or his wife, Sonia Chamsi) on the invoices by the sales company. This means that Solayman Chamsi obtained in total approximately EUR 1,746,279.06.[1]

It has to be assumed that the benefit obtained is no longer individually available from the accused. For this reason, he has to provide compensation pursuant to Art. 73a StGB [German Penal Code].

There are strong reasons for the assumption that the injured parties are entitled to civil claims in accordance with Art. 73 Paragraph 1 Sentence 2, 73a StGB.

A freezing injunction has to be granted to secure these civil claims on the part of the injured parties since it has to be assumed that the accused will try to move his assets in order to prevent or significantly complicate the subsequent enforcement of the claims of the injured parties after he has obtained comprehensive knowledge of the facts or the matter and the legal situation (Art. 111d Paragraph 2 StPO in conjunction with Art. 917 ZPO [German Code of Civil Procedure]).

Right from the outset Solayman Chamsi has tried to conceal where the funds were actually going both by using different identities and by controlling the payment streams.

While the invoices regarding the commission fees were issued by the sales companies "L. Bienestar S.L." and "Financial Service c.b. S.L.", the accused Schmidt was instructed to pay the amounts invoiced to the above mentioned account no. 4456529413 at Banco Caja Rural. However, even though "L. Bienestar S.L." or "Financial Service c.b. S.L." were specified as the recipient for the (partial) payments in the amount of EUR 265,053.95 and of EUR 158,145.69, Karim Liyo was registered by the bank as the holder of the account.

106 Js 54361/09

_____
[1] Source: Case file part 1 volume 4

Certified Translation from the German into the English Language

According to the current findings obtained in the investigations, however, "Karim Liyo" is only an alias used by Solayman Chamsi.

An amount of EUR 681,496.43, which was remitted to this account on the basis of the invoices issued by the sales companies, was intended for Karim Liyo according to the remittance. This was explained on the basis of the fact that payments have to be made directly to the persons who were (allegedly) responsible for the acquisition (as has already been explained).

As a result, the impression that Jean Suly (which is the alias which Solayman Chamis used in the contact with the accused Schmidt) was the real recipient of the payments was avoided from the outset.

Afterwards, Solayman Chamsi continued the concealments by moving an amount of EUR 123,482.85 from the above-mentioned account no. 4456529413 at Banco Caja Rural to his wife Sonia Chamsi.

The concern that Solayman Chamsi will do anything to move his assets in order to prevent or significantly complicate the subsequent enforcement of the claims of the injured party arises on account of the type and execution of the offence of which Solayman Chamsi is accused. This is the case, in particular, if fulfilment of the claims by compensation is expected with regard to the enforcement of the claims of the injured parties. In general, an accused party that has obtained a pecuniary advantage through an offence cannot be expected to remain passive when faced with the risk that a financial sum of the same amount will be declared lapsed as compensation.

In view of the serious nature of the offence and of the alleged offence, the injunction is appropriate also with regard to the accused party.

Appeals against this ruling are possible. Regardless of this, the accused party is entitled to a subsequent hearing at Dresden Local Court in the event that a disadvantage remains for said party after the execution of the measure according to Art. 33 Paragraphs 2 and 3 StPO.

[Stamp: Signed Vollmers
        Judge at the Local Court]
Judge at the Local Court

[Stamp: Executed
        Dresden, 29th May 2013
        [handwritten signature]
        Certifying Officer of the Office of the Court]

[Free State of Saxony *** Dresden Local Court ***]
106 Js 54361/09                                                                 Page 5

[Translator's confirmation: I hereby certify the above translation of the document submitted to me as a copy in the German language to be correct and complete.
Lützen, 13th September 2013]

Exhibit B

DOJ Order No. 2820-2006



# Office of the Attorney General
Washington, D.C.

ORDER NO. 2820-2006

### DELEGATION TO THE ASSISTANT ATTORNEY GENERAL
### FOR THE CRIMINAL DIVISION CERTAIN AUTHORITY
### RELATED TO FOREIGN FORFEITURE JUDGMENTS

Pursuant to the authority vested in the Attorney General by law, including 28 U.S.C. §§ 509, 510, and 2467, and the civil and criminal forfeiture statutes enforced or administered by the Department of Justice, I hereby delegate to the Assistant Attorney General for the Criminal Division, as my designee, my certification authority under 28 U.S.C. § 2467 with respect to the recognition of foreign forfeiture and confiscation judgments and related orders.

The Assistant Attorney General is authorized to redelegate to any subordinates the authority, functions, or duties vested in the Assistant Attorney General under this order.

5-9-06
Date

Alberto R. Gonzales
Attorney General

INTERNAL ORDER -- NOT PUBLISHED IN F.R.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

RECEIVED

NOV - 7 2013

Clerk, U.S. District and
Bankruptcy Courts

IN RE RESTRAINT OF ALL ASSETS )
CONTAINED OR FORMERLY CONTAINED IN )
ONE JPMORGAN CHASE BANK ACCOUNT )    Misc. No. *13-1256 RWR*
HELD BY SOLAYMAN CHAMSI )
_____ )

**ORDER PURSUANT TO
28 U.S.C. § 2467(d)(3)(A) AND 18 U.S.C. § 983(j)(1)(A)**

This matter comes to the Court on the United States' *Ex Parte* Application to Enforce and

Register a Foreign Restraining Order Pursuant to 28 U.S.C. § 2467(d)(3). In its *Ex Parte*

Application, the United States seeks an order pursuant to 28 U.S.C. § 2467(d)(3)(A),

(d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A), which provide this Court with jurisdiction to register

and enforce restraining orders and take such other action in connection with any property or

other interest subject to forfeiture in a foreign proceeding to ensure its availability for forfeiture;

and,

WHEREAS, through the information provided to this Court in the United States' *Ex*

*Parte* Application seeking enforcement of a German restraining order against all funds contained

or formerly contained in U.S. bank account 468419499 at JPMorgan Chase Bank N.A., owned or

controlled by Solayman Chamsi, the United States has established the following:

a) This Court has jurisdiction over the subject matter of this case, and pursuant to 28 U.S.C.
§ 2467(c)(2)(B), venue is appropriate in the United States District Court for the District
of Columbia;

b) The United States and Germany are parties to a bilateral mutual legal assistance treaty
("MLAT") that entered into force on October 8, 2009. The treaty provides for mutual
assistance concerning the immobilization and forfeiture of assets, including the proceeds
and instrumentalities of criminal offenses, that may be forfeitable or subject to seizure
under German law (Treaty Between the United States of America and the Federal

1

Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-Ger., Sen. Treaty Doc. 108-27, Oct. 14, 2003);

c) The restraining order issued by the Dresden Local Court in Dresden, Germany, attached hereto as Exhibit 1, establishes that a criminal investigation, including proceedings to forfeit assets, is underway in Germany against the owner of the Asset named below; this Asset is subject to restraint due to the investigation of Chamsi for serious fraud; the conduct giving rise to forfeiture under German law constitutes conduct that would give rise to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 982(a)(1), if committed in the United States;

d) The Attorney General of the United States Department of Justice has certified, through his designee, that enforcing the attached restraining order from Germany is "in the interest of justice";

e) The German restraining order has been rendered under a system of law compatible with the requirements of due process;

f) The Dresden Local Court that issued the September 9, 2013, restraining order appears to have jurisdiction over the subject matter; and

g) There is no indication that the Local Court's order was obtained by fraud;


NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, PURSUANT TO 28 U.S.C. § 2467(d)(3)(A), (d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A) THAT:

1) The restraining order issued on September 9, 2013, by Judge Vollmers of the Dresden Local Court in Germany, is hereby registered and enforced by this Court;

2) As per the Local Court's restraining order, Chamsi and all others persons are prohibited from in any way disposing of, dealing with, or diminishing the value of any of the Asset named herein;

3) The terms of the Local Court's restraining order are now effective outside the jurisdiction of Germany;

4) The following Assets, owned or controlled by Solayman Chamsi are hereby ordered RESTRAINED, specifically:

   a) JP Morgan Chase Bank account number 468419499;

5) All persons, including the suspect Chamsi, his agents, servants, employees, attorneys, family members and those persons in active concert or participation with Chamsi, as well as anyone holding an interest in the Asset, are hereby ENJOINED AND RESTRAINED from transferring, selling, assigning, pledging, distributing, giving away, encumbering, or

2

otherwise participating in the disposal of (by transfer of stock or otherwise) or removal from the jurisdiction of this Court, or from any checking, savings, or investment account, any interest, direct or indirect, in the Restrained Asset, without prior approval of the Court upon notice to the United States and an opportunity for the United States to be heard, except as specified in this Order or any future Orders entered by this Court;

6) The terms of this Order shall remain in full force and effect until forfeiture proceedings in Germany have concluded and any final forfeiture or confiscation order obtained therein has been presented for enforcement to this Court, or, until the Asset is sought to be released by the United States pursuant to a request by German authorities;

7) The U.S. Department of Justice, Asset Forfeiture and Money Laundering Section, shall attempt to provide a copy of this Court's Order to the owner of the Asset and to anyone else known to the United States as holding a protected interest in the Asset in a manner reasonably calculated to apprise them of their right to be heard;

8) The U.S. Department of Justice, Asset Forfeiture and Money Laundering Section, will serve a copy of this Order on the affected financial institution by facsimile or other means;

9) JPMorgan Chase Bank N.A., within three business days of service, shall provide the United States with the balance of the above-listed account and a description of the nature and value of the asset owned or controlled by Chamsi; and

10) JP Morgan Chase Bank N.A shall provide monthly statements of the above-listed account to the U.S. Department of Justice, c/o Marybeth Grunstra, Trial Attorney, Criminal Division, Asset Forfeiture and Money Laundering Section, 1400 New York Avenue NW, 10100, Washington, DC 20530, until further notice or Order of this Court.

**SO ORDERED.**

Dated:

_____
United States District Judge